**FILED**

JAN **1 9** 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | |
|---|---|
| **NAUTILUS, INC.** §<br>§<br>**PLAINTIFF,** §<br>§<br>**v.** §<br>§<br>**ICON HEALTH & FITNESS, INC.** §<br>§<br>**DEFENDANT.** § | **Civil No. SA-16-CV-00080-RCL** |

---

**Memorandum Opinion:**
**Granting the Plaintiff's Motion for Summary Judgment**
**Denying the Defendant's Motion for Summary Judgment**
**Denying as Moot All Other Motions**

---

### <u>Summary</u>

The Court has before it the parties' cross-motions for summary judgment.

The plaintiff—Nautilus, Inc.—and the defendant—ICON Health & Fitness, Inc.—are parties to a patent licensing agreement (the "contract"). Pursuant to the contract, Nautilus gave to ICON a license to incorporate Nautilus's patented technology into ICON's ellipticals. In return, ICON agreed to pay to Nautilus a royalty on the sales of ellipticals covered by any of Nautilus's patents. By January 25, 2015, all of Nautilus's patents had expired except for its Chinese patent.

Under the plain terms of the contract, ICON need only pay royalties on the sale of "Products" (with a capital "p"). The definition of "Products" in the contract unambiguously incorporates and is limited by the scope of "the intangible legal rights and interests that exist" in Nautilus's patents. Because these legal rights can only be determined with reference to the underlying substantive patent law that creates those rights, determining what is and is not a "Product" on which ICON must pay royalties requires reference to that underlying patent law.

Here, Nautilus contends that the products in question are covered by Nautilus's Chinese patent, which was issued under and is governed by Chinese law, so the Court must apply Chinese law to determine whether ICON's products infringe on the Chinese patent. Doing so, the Court concludes that ICON's products—elliptical component parts and assembly instructions that are fabricated and packaged, but not finally assembled, in China—infringe on the Chinese patent. Therefore, ICON's products are "Products" on the sales of which ICON must pay royalties to Nautilus.

For these reasons, the Court will grant Nautilus's motion for summary judgment, deny ICON's motion for summary judgment, and deny all other pending motions in the case as moot.

## Background

The plaintiff, Nautilus, Inc. ("Nautilus"), is an exercise-equipment company that owns a series of now-expired patents relating to the design and manufacture of ellipticals. The defendant, ICON Health & Fitness, Inc. ("ICON"), develops and manufactures exercise equipment—including ellipticals—for sale around the world.

In 2004, Nautilus's and ICON's predecessors-in-interest entered into a patent licensing agreement (the "contract").[1] Nautilus and ICON are the current parties to the contract. Under the contract, ICON received a non-exclusive license to certain Nautilus patents in exchange for its agreement to pay to Nautilus a five percent royalty on the gross sales of all "Products" (as defined by the contract) manufactured and sold by ICON that practiced the licensed patents. The licensed patents concerned the parts for and the manner of constructing "front-end" ellipticals. Some of the patents were U.S. patents while others were foreign patents. On January 25, 2015, all of the patents licensed under the PLA had expired except for one—Nautilus's Chinese patent.

---

[1] The parties have amended the contract several times in the past 13 years. The Court will use the term "contract" to refer to the contract as amended.

After the expiration of the U.S. patents, ICON continued manufacturing ellipticals in China. Some of these ellipticals were shipped—unassembled, but with instructions to complete assembly—to purchasers in the United States. ICON initially paid royalties on a portion of these sales. But in December 2015 ICON took the position that these manufactured-but-unassembled ellipticals sold to United States consumers did not qualify as "Products" under the PLA and stopped making royalty payments. Nautilus disagreed and demanded royalty payments. ICON ultimately refused to make the payments. The parties have now sued each other, with Nautilus seeking payment of the royalties it believes it deserves and ICON seeking a refund of the royalty payments it believes it made in error.

## The Cross-Motions for Summary Judgment

The parties agree as to the material facts of the case. Between January 25, 2015 (when the U.S. patents expired), and January 25, 2016 (when the Chinese patent expired), ICON manufactured the component parts of its ellipticals and packaged those parts, together with assembly instructions, in China. Some of these unassembled ellipticals were sold to consumers in the United States and other countries in which Nautilus held no valid patents. These consumers would complete assembly of the ellipticals themselves in the United States.

While the parties agree on these facts, the parties disagree as to the application of the contract as it relates to the sale of the unassembled ellipticals. Nautilus asserts that the unassembled ellipticals sold in the United States are "Products" under the plain terms of the contract. ICON disagrees, arguing that the PLA's definition of "Products" incorporates the doctrine of patent infringement and that the unassembled ellipticals do not infringe the Chinese patent.

So the Court must determine whether defining the term "Products" under the contracts requires reference to Chinese patent law. And if it does, the Court must determine whether the unassembled ellipticals and their assembly instructions, sold in the United States, infringe the Chinese patent. But if it does not, the Court will still need to decide whether the ICON products in question fall within the contract's definition of "Products" on which royalties must be paid.

## Analysis

I. **The Court Must Conduct an Infringement Analysis Under Chinese Patent Law to Determine Whether the ICON Must Pay Royalties on the Products at Issue.**

A. **ICON Need Not Pay Royalties to Nautilus for Everything It Sells—Just for "Products" as Defined by the Contract.**

The starting point for the Court's analysis is Section 3.1 of the contract, which is the royalties clause. The royalties clause reads, in relevant part, as follows:

> During the Term of this Agreement, in consideration of the Patent Rights licensed to Licensee under this Agreement . . . for all Products that are either made, have made, used, sold, offered for sale, or imported in the Field of Use in the Territory, Licensee shall pay Licensor a royalty of five percent (5%) of the gross sales of such Products by Licensee (the "Royalty").

(ECF #39-2 at 30). This clause contains many specially-defined terms, the majority of which (Licensee, Licensor, Field of Use, Territory, Term, Agreement) are not in dispute and do not figure in any important way in the dispute between the parties. What is in dispute, however, is the term "Products." As the royalties clause makes plain, ICON does not owe royalties to Nautilus for everything that ICON sells in the Field of Use in the Territory. Rather, ICON only owes royalties to Nautilus on the gross sales of "Products" as defined by the contract. That is the heart of the current dispute. Nautilus contends that the ICON products in question— unassembled component parts and assembly instructions packaged in and shipped from China, but sold to U.S. customers— are "Products" as defined by the contract and ICON contends that they are not.

**B. The Contract's Definition of "Products" Requires an Infringement Analysis Under Chinese Patent Law.**

The contract defines "Products," in part, as "any apparatus, system or products covered by at least one Claim of any of Licensor's Patent Rights." (Section 1.5). The word "Claim" in that definition "means . . . the issued claims of the Patent Rights." (Section 1.8). The term "Patents Rights" in both of those definitions means the "intangible legal rights or interests that exist" in any of Nautilus's patents. (Section 1.1). And the "Licensor" is Nautilus. Replacing the statutory terms with their definitions, then, gives us the following definition of "Products": any apparatus, system or products covered by at least one issued claim of any of the intangible legal rights or interests that exist in any of Nautilus's patents.

The Court finds that the phrase "covered by" in the definition of "Products" plainly means "infringing." Nautilus argues that this is not so because ICON's ellipticals can, somehow, be "covered" by Nautilus's patents without also infringing on the patents. This cannot be. If Nautilus was right, the definition of "Products" would not be limited by the legal rights and interests existing in the patents. But as demonstrated above, the definition of "Products" in the contract is explicitly tied to the "legal rights or interests existing in" the patents. This clearly shows that those rights and interests are intended to limit what counts as a "Product." The legal right existing in a patent is the right to a legal monopoly—the exclusive right to manufacture, use, or profit from the subject of the patent. Any violation of that legal monopoly without the patentee's authorization is an infringement, nothing more and nothing less. Patent rights, then, "cover" no more than that which infringes the patent because the patent creates only a legal right against infringement. Any interpretation of the phrase "covered by" that goes beyond the scope of the

patent rights that may be infringed, then, renders unintelligible the definition's incorporation of the patent rights.

This understanding aligns perfectly with the purpose of a licensing agreement. The patentee holds a patent, which gives the patentee a legal monopoly in the utilization of the patented technology. Because of that legal monopoly, the patentee may assert a cause of action for infringement against any party that utilizes the technology without the patentee's assent. The licensee, meanwhile, desires to infringe upon (utilize) the patented technology. To do this, the licensee pays money to the patentee in exchange for the patentee's permission to infringe on the patent. The licensee is not paying to do that which does not infringe on the patent because the patentee has no right to prevent the licensee from doing that which does not infringe on the patent. Therefore, absent clear and unambiguous language to the contrary, it makes no sense to say that a licensing agreement covers anything except that which would infringe on the patent being licensed. Merely using the phrase "covered by" instead of "infringing" is not clear and unambiguous language to the contrary.

For these reasons, the incorporation of "Patent Rights" into the definition of "Products" only makes sense if the phrase "covered by" means "infringing." And as "covered by" means "infringing," determining whether the little-p products at issue here—component parts and assembly instructions for ellipticals that are packaged, but not assembled, in China and then sold to countries in which Nautilus has no valid patents—are capital-p "Products" on which ICON must pay royalties requires an infringement analysis under the relevant country's patent law—China's.

### C. Nautilus's Argument that ICON Admitted that Its Products Are Covered by the Chinese Patent Are Unavailing.

In addition to its argument, disposed of above, that "covered by" means something other than "infringing," Nautilus asserts that ICON admitted that the disputed products are covered

by the Chinese patent. Nautilus argues that ICON admitted to this in two ways: (1) ICON "contractually admitted" that these products are covered by the Chinese patent, and (2) ICON admitted the products are covered by the Chinese patent in its responses to depositions and interrogatories. For the following reasons, the Court disagrees that ICON made any such admission.

### 1. ICON Did Not "Contractually Admit" that the Products in Question Are Covered by the Chinese Patent or Otherwise Subject to Royalty Payments.

Nautilus points to numerous contractual provisions beyond the clause defining "Products" on which royalties must be paid to support its contention that ICON agreed to pay royalties on the disputed products. As the Court will explain, none of these provisions actually support that contention.

First, Nautilus points to the "Agreed Background Facts" section of the contract, which reflects "the fundamental understanding and intent of the parties in entering the" contract. (ECF #42-3 ¶18(a), (b)). That is all well and good, but it does not support Nautilus's position. The "Agreed Background Facts" section establishes the following: (1) Nautilus owns the patents relevant to this dispute, (2) ICON sells fitness products (ellipticals), and (3) Nautilus intended to give to ICON a non-exclusive license to the patents in return for royalties "*pursuant to the terms and conditions of this Agreement.*" (ECF #39-2 at 4 (emphasis added)). This section makes clear that Nautilus was to receive royalties subject to the terms of the contract, which, as the Court has explained, requires royalty payments only for the sale of "Products" as those are defined within the contract. Nothing in these background facts supports the argument that ICON agreed that any particular product was subject to the royalty payments.

Second, citing Sections 1.1, 1.5, 2.1, 3.1, 3.3, and 5.2 of the contract, Nautilus makes the bold assertion that the "parties agreed that ICON's ellipticals were covered by each of the

patents subject to the PLA." (ECF #42-3 ¶18(c)). But Nautilus is wrong. Sections 1.1 and 1.5 define "Patent Rights" and "Products" respectively, and the Court parsed their language earlier in this opinion. Section 2.1 is the grant of the license. Section 3.1 is the royalties clause, which the Court has already made clear requires royalty payments only on the sales of "Products" as defined in Section 1.5. Section 3.3 states that the royalty is to be a flat-rate royalty; it says nothing about what actually counts as a "Product" on which that flat-rate royalty must be paid.[2] And Section 5.2 states only that ICON agrees that Nautilus's patents are valid and enforceable. But ICON is not attacking the validity of the Chinese patent, only its scope. In short, none of the contractual provisions cited by Nautilus actually support its contention that ICON agreed that its ellipticals were covered by the patents. The provisions only establish that ICON agreed to pay royalties on ellipticals that actually were covered by the patents.

Third, Nautilus argues that ICON contractually agreed that all of its ellipticals are "Products" because the definition of "Products" expressly incorporates Schedule C of the contract, (ECF #39-2 at 5, ¶1.5), and "Schedule C identifies the types of ICON products covered by the

---

[2] Section 3.3 deserves a little bit more discussion. It states that the

> parties understand that the coverage of Licensor's Patent Rights may vary in different countries in the Territory (for example, in some countries more patent claims may cover a Licensee product, as compared to other countries). In order to ease and simplify Licensee's administration in paying the Royalty to Licensor, Licensor has agreed to receive a flat rate Royalty for the sale of Products in all countries in the Territory instead of receiving different Royalty rates depending on the amount of coverage of Patent Rights in a particular country.

(ECF # 39-2 at 7, ¶3.3). So if an ICON product is covered by three (3) patent claims in Country A and by one (1) claim in Country B, the royalty rate for the sales of that product will be the same in both countries. Nautilus contends that this clause "leaves no doubt that the parties expressly [agreed] to avoid dispute about the coverage of all ICON Products by all the patents subject to the" contract. Not so. Section 3.3 is not a blanket bar on contesting whether ICON products are covered by Nautilus patents at all. ICON agreed to pay royalties on the sales of "Products" as defined by Section 1.5, and Section 3.3 reinforces that royalties are only owed "for the sale of Products." The definition of "Products" requires actual coverage by at least one of the patents held by Nautilus. If an ICON product is not covered by any of Nautilus's patents, then it is not a Product on which royalties are owed and Section 3.3 has nothing to say about it. If Nautilus wished to receive royalties on the sale of all ICON ellipticals rather than just those covered by its patented technology (i.e. "Products"), it should have said so in the contract. But it did not.

[contract], which are ellipticals containing the patented features depicted therein." (ECF #42-3 ¶18(d), (e)). The Court disagrees with this interpretation of Schedule C. Looking at Schedule C, all the Court sees is a picture of an elliptical. (ECF #39-2 at 19–20). Nautilus's interpretation of this is basically that all elliptical-looking things count as "Products". But this is an impermissibly broad interpretation of a picture. It would render completely superfluous the rest of the definition of "Products." There would be no need to incorporate Nautilus's patent rights into the definition if all things resembling a picture of an elliptical counted as "Products."

Instead, the meaning of this mysterious picture of an elliptical is best understood from the label given to it and the context in which the contract was first made. The picture is labeled "FreeMotion Institutional Elliptical," which seems to be the name of a certain elliptical model that the original licensee was producing and selling at the time the contract was first negotiated and solemnized. (ECF #39-2 at 18). In addition, not all of the relevant patents were finalized at the time of the contract's formation—the original licensor still had several patents that were merely in the application stage (including the Chinese patent involved in the present dispute), which were identified in Schedule B of the contract. (ECF #39-2 at 17). As such, the Court thinks it best to interpret Schedule C and its incorporation into the contract's definition of "Products" as a stopgap measure. It ensured that the licensor would receive royalties on the sale of the FreeMotion Institutional Elliptical throughout the entire scope of the Territory even though all of the necessary patents were not yet in place. Once the patent applications specified in Schedule B were approved, the single elliptical model identified in Schedule C would ostensibly be covered by those patents, as would future models and products on which royalties would be owed. This reading of Schedule C successfully gives a meaning and function to Schedule C (as a stop-gap measure until the Schedule B patents applications could be approved) without making fully redundant the contract's

incorporation of Nautilus's patent rights into the definition of "Products." For these reasons, then, the Court does not agree that Schedule C identifies "the types of ICON products covered by the" contract. Rather, it identifies a single product (or model thereof), the FreeMotion Institutional Elliptical, that is not the subject of any of the contested royalties. But at the very least, Schedule C cannot be interpreted so broadly as to incorporate all things resembling ellipticals (or containing elliptical features that Nautilus claims are patented technology) into the definition of "Products" in a way that would render superfluous the need for patent rights.

Therefore, nowhere in the contract does ICON admit that its contested products are "covered by" the Chinese patent or that they are "Products" as contemplated by the contract.

## 2. ICON Did Not Admit that Its Products Are Covered by the Chinese Patent.

Nautilus argues that "ICON admits that the ICON Products are covered by the Chinese patent subject to the" contract. (ECF #42-3 ¶20). Nautilus then refers to numerous portions of ICON's responses to interrogatories and depositions in which Nautilus claims these admissions happened.[3] The Court will not copy all of the disputed statements in this opinion or address them one-by-one. The essence of the statements is that ICON does concede that its ellipticals, *when purchased and fully assembled in China*, are covered by the Chinese patent. But through all of its statements, ICON consistently maintains that the products disputed in this litigation—unassembled component parts and their assembly instructions that are purchased by U.S. customers and assembled in the U.S.—are not covered by the Chinese patent because that arrangement does not constitute infringement under Chinese patent law. ICON's statements about Chinese patent law may or may not be right (ultimately, they are wrong), but for now it is enough to say that they do not constitute an admission that the products are covered by the Chinese patent.

---

[3] The full list of passages to which Nautilus refers is found in ECF #42-3 ¶¶ 18(b)–(d).

### D. Conclusion

The Court concludes that ICON did not admit that its products are covered by the Chinese patent as they must be to count as "Products" on whose sale royalties are owed. Therefore, the Court must determine whether ICON's products are covered by the Chinese patent by conducting an infringement analysis under Chinese patent law.

## II. ICON's Products Infringe on Nautilus's Chinese Patent; Therefore, ICON Must Pay Royalties on Their Sale.

Both parties submitted to the Court expert reports from persons qualified to discuss the content and application of Chinese patent law. (ECF #39-2 at 34–45; ECF #39-3). Having reviewed the applicable Chinese law, the experts' reports, and the facts of this case, the Court concludes that the ICON products at issue in this litigation infringe upon the Chinese patent. Therefore, the ICON products are "Products" as defined in the contract and ICON must pay royalties on the sales of those products.

### A. The Content of Chinese Patent Law

The basic guidelines for determining foreign law are set forth in Federal Rule of Civil Procedure 44.1. It says, in relevant part, "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a part or admissible under the Federal Rules of Evidence. The Court's determination must be treated as a ruling on a question of law." (Fed R. Civ. P. 44.1).

### 1. Statutory Law and Supreme People's Court Interpretations of Law

With the exception of the role of decisions made by Chinese lower courts (which the Court will address later), the parties largely agree as to the sources to which the Court should look to determine the content of Chinese patent law. Specifically, the appropriate sources of law are the statutory Patent Law, the Implementing Regulations of the Patent Law, and Supreme

People's Court ("SPC") Interpretations of Law. (ECF #39-2 at 35 (ICON's expert's statement of what sources of law are relevant); ECF #39-3 ¶¶22–25 (Nautilus's expert's statement identifying substantially the same sources of law)). The parties also largely agree as to the specific provisions of these bodies of law that the Court ought to apply.[4] The majority of the Court's analysis will revolve around Article 11 of the Patent Law and Article 7 of the "Supreme People's Court Interpretation on Issues Concerning the Application of Law in the Trial of Disputes over Infringement of Patent Rights." ICON identifies and provides several other provisions of the Patent Law and SPC interpretations to which the Court will also cite, even if they will not form the crux of the Court's analysis.

The Court now provides a list of the Patent Law statutes and SPC interpretations that it will use in its analysis:

> **The Law on Choice of Law for Foreign Related Civil Relationships ("Choice of Law"), Article 49:** The ownership and contents of intellectual property rights are governed by the laws of the territory of protection of the intellectual property rights. (ECF #39-2 at 35).

> **The Law on Choice of Law for Foreign Related Civil Relationships ("Choice of Law"), Article 50:** The laws of the territory for protection of intellectual property rights, or of the forum agreed by the parties after occurrence of infringing activity, should apply to determine the liability for infringement. (*Id.*).

> **Patent Law, Article 11:** After an invention or utility model patent is granted, unless it is otherwise prescribed by the Law, no entity or individual may, without permission of the patentee, exploit the patent, i.e., manufacture, use, offer to sell, sell, or import the patented product, or use the patented process and use, offer to sell, sell, or import the product directly obtained from the patented process, for production or commercial purposes. (ECF #39-3 ¶22).

---

[4] Each party has also provided its own translations of the relevant provisions to the Court. The Court does not find that the translations are different in any way that would affect the meaning of the provisions. As a stylistic matter, the Court prefers the diction and flow of Nautilus's translations better than ICON's translations, so the Court will use the translations provided by Nautilus throughout this opinion. The only exception to this rule will be circumstances where ICON cites to a provision to which Nautilus does not cite.

**Patent Law, Article 59:** The protection scope for rights to a patent for invention or utility model shall be confined to the content of the claims. The description and the appended drawings may be used to interpret those claims. (ECF #39-4 ¶14).

**Several Provisions of the Supreme People's Court on Issues Relating to Application of Law to Adjudication of Cases of Patent Disputes, Article 17 (effective 2015) ("SPC 2015"):** The protection scope for rights to a patent for invention or utility model shall be confined to the content of the claims. The description and the appended drawings may be used to interpret the claims as mentioned in paragraph 1 of Article 59 of the Patent Law means that the scope of protection of the patent shall be determined by the scope defined by all technical features expressly stated in the claims, and shall also include the scope defined by equivalent features to those technical features." (*Id.* ¶16).

**Interpretation of the Supreme People's Court on Several Issues Concerning the Application of Law in the Trial of Patent Infringement Dispute Cases, Article 7 (effective January 1, 2010) ("SPC 2010"):** In determining whether the allegedly infringing technical solution falls within the scope of protection of a patent, the courts shall examine all the technical features recited in the claim claimed by the patent holder. Where an alleged infringing technical solution comprises technical features identical or equivalent to all the technical features recited in the claim, the courts shall determine that such technical solution falls within the scope of protection of the patent; where by comparison with all the technical features recited in the claim, the allegedly infringing technical solution lacks at least one technical feature recited in the claim, or comprises at least one technical feature which is neither identical nor equivalent to any technical feature recited in the claim, the courts shall determine that the allegedly infringing technical solution does not fall within the scope of protection of the patent. (ECF #39-3 ¶25).

Putting all of this together reveals a fairly straightforward process for determining patent infringement. First, the allegedly infringing product must contain "technical features identical or equivalent to *all* the technical features recited in the claim"; only then does the product fall within the scope of the Chinese patent protections. (SPC 2010 (emphasis added)). Second, once it has been established that the product falls within the scope of the Chinese patent protections, that

product must be "manufacture[d], use[d], [offered for sale], s[old], or import[ed] . . . for production or commercial purposes." (Patent Law, Article 11). And finally, because patent law is territorial, all of this must occur within China. (Choice of Law, Articles 49 and 50).

## 2. The Precedential Value of Decisions by Chinese Lower Courts

The parties disagree about the weight to be given to prior patent decisions of Chinese lower courts when conducting the infringement analysis. The answer given by ICON is straightforward—none. Only SPC guidance is precedential. According to their expert, "China follows the civil law system, and there is no common law principle of *stare decisis*. However, judicial guidance is provided in the form of periodic advisory opinions issued by the Supreme People's Court," and only this judicial guidance from the SPC is binding. (ECF #39-2 at 35).

Nautilus's expert takes issue with this. Nautilus's expert agrees that "China is not a common law country," (ECF #39-4 ¶8), but states that "guiding cases of [the SPC] have precedential value and influence on the judgment of lower courts at local levels as well as on future SPC decisions." (*Id.*). Up to this point, Nautilus and ICON don't really disagree. ICON's expert acknowledges that the SPC issues interpretations of law that are binding on lower courts and can also select cases decided by itself or by lower courts that it wants to elevate to the level of precedent. The point is clear—official guidance from the SPC has precedential value. Both parties rely on it, and so will the Court.

The real point of contention, then, is not what to do with SPC decisions or guidance, but what to do with Chinese lower court decisions, of which ICON cites none (because, they argue, such opinions have no precedential value), and of which Nautilus cites several. Nautilus informs the Court that at least one district in China has introduced a "precedential judgment system, requesting the courts to reference the judgment of previous courts when dealing with similar facts."

(*Id.* ¶9).  But Nautilus does not make clear how many—or whether—other districts in China have followed suit.  The scope of the practice is entirely unclear.  Nautilus's expert also tells the Court that based on her "experience in litigating intellectual property cases in China, in addition to the SPC's guiding cases, the local people's courts also follow the precedents rendered by the upper level court," and then gives an example.  (*Id.* ¶13).

The Court does not doubt that Chinese courts look to each other for guidance when they decide cases.  But nothing that Nautilus's expert provides convinces the Court that China has a wholesale system for giving precedential value to judicial decisions, especially given Nautilus's own admission that China is not a common law country.  In light of China's status as a civil law system, and given the examples provided by Nautilus of Chinese courts referring to each other, the Court can conclude that Chinese courts find the decisions of other Chinese courts to have persuasive value.  This accords with the classic status of prior judicial decisions in a civil law system as recounted by the late Justice Scalia: "There is no [*stare decisis*] requirement in the civil-law system, where it is the text of the law rather than any prior judicial interpretation of that text which is authoritative.  Prior judicial opinions are consulted for their persuasive effect, much as academic commentary would be; but they are not *binding*."  (ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 7 (1997) (emphasis in original)).  So while the Court will not give binding deference to any of the lower-court decisions cited by Nautilus, the Court will consult them for their persuasive power, if any.

## B. ICON's Products Infringe on the Chinese Patent

An infringement analysis must begin with the text of the patent claims.  China's Patent Law is clear that the "protection scope for rights to a patent for invention or utility model shall be confined to the content of the claims."  (Patent Law, Article 59).  Here, the Chinese patent

comprises three claims, in which Claim 1 is an independent claim directed to an apparatus for exercising, while Claims 2 and 3 are dependent claims referring to Claim 1. Claim 1 reads as follows:

> An exercising apparatus for exercising comprising:
>
> a frame having a base portion adapted to be supported by a floor;
>
> a coupling member having (i) a pulley supported and limited by said frame defining a pivot axis, and (ii) means for attaching said second ends of said first and second reciprocating members to said pulley so that rotation of said pulley results in the rotation of said second ends of said first and second reciprocating members in a circular path about said pivot axis, while each portion of said first and second reciprocating members distal said second end of each said first and second reciprocating member moves in a reciprocating pattern; and
>
> first and second rotation linkage assemblies, each being connected to the corresponding reciprocating member of said first and second reciprocating members at middle position between first and second ends of the said reciprocating members, for orienting the bottom of the foot of the user of the apparatus so that each foot of the user moves in a substantially elliptical path pattern during operation of the apparatus;
>
> said coupling member attaching means comprising:
>
> a first element, one end of which is attached to said pulley at one end proximate to said pivot axis and the other end of which is attached to said second end of said first reciprocating member; and
>
> a second element, one end of which is attached to said pulley at one end proximate to said pivot axis and the other end of which is attached to said second end of said second reciprocating member.

(ECF #39-3 at 26). That is very dense language. But the claim can be understood as containing two basic parts: (1) a description of individual components and (2) the structural relationships between the components. And according to SPC 2010, in order to infringe on the patent claim, ICON's products must contain "technical features identical or equivalent to *all*" of these features, both the components and the relationships between them. As a final reminder, the ICON products

in question consist of the unassembled component parts of ellipticals packaged together with their assembly instructions to be shipped to and finally assembled in America and elsewhere.

There is no viable argument that the individual components described in the Nautilus patent are not contained in the ICON product package. The patent mentions the following components: (1) the frame, (2) the base portion of the frame, (3) the first and second reciprocating members, (4) the first end and second end of the reciprocating members, (5) the coupling member which further comprises (6) the pulley and (7) the means for attaching the first and second element, (8) the first and second rotation linkage assemblies, and (9) the top portion of the frame. There is no doubt that the ICON packages contain all of these parts—the entire point is that the package contains all of the component parts of the elliptical and all the end user needs to do is assemble them.

The only question, then, is whether ICON's inclusion of the user manuals / assembly instructions in the packages qualifies as the inclusion of the structural relationships between the components as described by the patent.

ICON contends that it does not. According to ICON's expert, if

> "ICON does not connect the stationary and mobile components with interacting members as specifically described in the patent claims, it does not practice the Patent. . . . The act of collecting the required components into one box, and providing instructions on assembly of the components, does not fulfill the requirements to practice the Patent. The Products were not assembled in the Patent territory, China. . . . Therefore, the Patent is not practiced in China, and liability for patent infringement does not arise for the Products."

(ECF #39-2 at 37–38). In other words, only by actually assembling the elliptical in its entirety in China could ICON create a product containing the structural relationships between the component parts. And because the structural relationship between the component parts is a part of the Chinese patent claim, the lack of assembly means that the patent was not infringed.

The Court does not believe this is the correct interpretation of the scope of the patent's protections. While the scope of the patent's protection is limited by the words in the claims, SPC 2015 instructs the Court to be aware of equivalent features in a potentially infringing product. SPC 2015 says that the scope of a patent's protection "also include the scope defined by equivalent features to [the] technical features" described in the patent claims. The Court thinks it unlikely that the only way to "practice" the structural relationship aspects of the patents is by actual assembly. Such a conclusion would permit the entire Chinese patent system to be evaded merely by relying on the end user for final assembly of a product. And because Chinese patent law embraces the "all-elements" rule (i.e., requires that every single technical feature described in the patent be present in the allegedly infringing product), that interpretation would result in absurdities.

Imagine, for instance, that ICON's manufacturer had assembled the entire elliptical with the exception of attaching the foot stand (the "first reciprocating member" mentioned in the patent) to the pulley on one end. It would be patently obvious in this circumstance that all that needs to be done to complete assembly and use the elliptical would be to attach the foot stand and the pulley. But under ICON's interpretation, this arrangement would not infringe on the patent because it would not disclose *all* of the structural relationships mentioned in the patent claims. Nothing in the statute requires such an absurd result because the statue does not say that the only way structural relationships can be practiced is through assembly.

What is important under the statute then, is not physical assembly, but disclosure of the proper relationships—the knowledge of how to take all of these component parts and put them together into a functioning machine. Anything that provides this knowledge would be a suitable "equivalent feature to [the] technical features" that are the structural relationships between the component parts. As Nautilus's expert discusses in great detail in her expert report, the user

manuals / assembly instructions that ICON includes in the packages disclose the proper relationship between all the component parts and how to assemble them. Therefore, ICON's inclusion of assembly instructions constitutes the "technical feature" of the structural relationship between the component parts.

Though the decision is not binding, the Court is reassured that its conclusion is the proper application of Chinese Patent Law by the court cases cited by Nautilus. Most pertinent is the decision of the Shantou Intellectual Property Bureau, affirmed by the Guangdong High People's Court. In that case a toy manufacturer argued that its product did not violate a patent because the toy was sold in parts and assembled by end users. The Bureau disagreed, ruling that

> "although the products manufactured by the respondent are not in an assembled status, all the components of the four-wheel drive toy have been packaged and delivered to the end users; the assembly instructions are printed on the inner side of the packaging of the product, which explicitly guide consumers to assemble the components into a final completed four-wheel drive toy; therefore, the respondent's claim that the infringement comparison can only be carried out based on the final assembled product cannot be supported."

(ECF #39-3 ¶35). The Court finds it disconcerting that it cannot find a more detailed citation to this case in the expert report, but given that ICON's expert responds to the case, the Court finds no reason to doubt its authenticity. To be clear, the Shantou Intellectual Property Bureau's reasoning is in no way binding on this Court. But it is persuasive. It makes sense that structural relationships can be violated through providing assembly instructions as well as through actual assembly. And so the Court uses the same reasoning here.

The Court has completed the first step of the infringement analysis and determined that the ICON products contain "technical features identical or equivalent to *all* the technical features recited in the claim." (SPC 2010 (emphasis added)). The Court now proceeds to the second step

of determining whether ICON "manufacture[d], use[d], [offered for sale], s[old], or import[ed] [the products] for production or commercial purposes." (Patent Law, Article 11).

ICON argues that it did not manufacture the products because it did not complete final assembly of the ellipticals. It also argues that "exporting the components for assembly outside of China is not among the prohibited acts listed in Article 11 of the Patent Law, and therefore does not constitute practice of the Patent." (ECF #39-2 at 37–38). Again, the Court disagrees.

The Court has already made clear that inclusion of final assembly instructions with all of the necessary component parts is equivalent to actual assembly for purposes of practicing the Chinese patent. And there is no doubt that the component parts and assembly instructions are made, printed, and packaged together by ICON or its contracted manufacturer. In addition, ICON's company name is printed on the user manuals and ICON is listed as the warrantor of the products. Therefore, the Court thinks it obvious that ICON manufactures the products that infringe on Nautilus's Chinese patent.

Alternatively, the Court finds that ICON sold the infringing products. ICON argues that exporting for assembly outside of China is not one of the acts prohibited by Article 11. But again, the final assembly is irrelevant to this analysis because the assembly instructions serve the same purpose in the infringement analysis. The only question, then, is whether exporting the goods is one of the acts prohibited by Article 11. Multiple Chinese courts have reasoned that exporting counts as selling. (*E.g. Zhejiang Xi De Er Electrical Appliance Co., Ltd., Zhejiang Baige Import and Export Co., Ltd. V. Ningbo Jiangbei Chuangxin Electrical Appliance Co., Ltd.* (case no. (2010)

*Zhe Zhi Zhong Zi Di* 312); *Ren Qifeng v. Sunwu Longxing Economic and Trade Co., Ltd.* (case no. (2007) *Yong Min Si Chu Zi Di* 187)).[5] And this Court agrees.

Finally, even if exporting itself is not selling, there is no doubt that ICON offered its products for sale from China. "Offering for sale" is another of the activities prohibited by Patent Law, Article 11. So be it through manufacturing its products, selling its products, or offering to sell its products, ICON committed an act forbidden by Article 11. These acts were for commercial purposes. Therefore, ICON performed a forbidden act with a product that fell within the scope of protection of the Chinese patent—that is infringement.

And lastly, due to the territorial nature of Chinese patent protections, ICON must have infringed on the patent within China's territorial bounds. This cannot be disputed. The products were manufactured and packaged in China and exported from China.

For these reasons, the Court finds that ICON's products infringed on Nautilus's Chinese patent.

### C. Putting It All Together—ICON Owes Royalties on the Sales of the Products

Because the disputed ICON products infringe on Nautilus's Chinese patent, there is no doubt that the products are "apparatus[es], systems or products covered by at least one Claim of any of [Nautilus's] Patent Rights." (ECF #39-2 at 5, ¶1.5). In other words, ICONs products are "Products" as defined in the contract and ICON was required to pay royalties to Nautilus for sales that occurred prior to the Chinese patent's expiration on January 25, 2016.

---

[5] This is how Nautilus's expert cites these cases. Due to the difficulty of finding and incorporating Chinese characters, the Court suffices to use this citation. For the expert's discussion of these cases' contents, in addition to their Chinese citations see ECF #39-3 ¶¶58–59.

### III. The Doctrine of Patent Misuse Is Inapplicable to this Case and Does Not Excuse ICON's Failure to Pay Royalties.

ICON argues that it cannot be made to pay royalties on the ellipticals it sells in the United States—even though the contract requires these payments—because doing so would violate the doctrine of patent misuse. But ICON's interpretation of the function and scope of the patent-misuse doctrine is incorrect. The doctrine of patent misuse does not preclude the payment of royalties in this case.

#### A. Legal Standard

The patent-misuse doctrine is an "equitable rule that patentees should not be allowed to use their patent to effectively broaden the scope of their monopoly in restraint of trade or otherwise against the public interest." (*Patent-Misuse Doctrine*, BLACK'S LAW DICTIONARY (10th ed. 2014)). The doctrine has many applications, but the version argued by ICON derives from the rule set forth by the Supreme Court in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964). In that case, the Supreme Court held (in no uncertain terms) "that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." (*Id.* at 32). Contracts that call for a licensee to pay royalties on a product after the patent for that product has expired are unenforceable. (*Id.*). This is a bad rule, as many courts and scholars have explained at great length. (*E.g.*, *Id.* at 34–39 (Harlan, J., dissenting); *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1017–18 (7th Cir. 2002); Harold See & Frank M. Capiro, *The Trouble with* Brulotte*: the Patent Royalty Term and Patent Monopoly Extension*, 1990 UTAH L. REV. 813). But despite the problems, the Supreme Court reaffirmed the holding in *Brulotte* on *stare decises* grounds a mere three years ago. (*Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2415 (2015)). And so this Court will dutifully follow the rule set forth in *Brulotte* insofar as it applies to this case.

But the rule in *Brulotte* is not absolute. Parties "can often find ways around *Brulotte*, enabling them to achieve" the end of creating an enforceable agreement to make royalty payments beyond the expiration date of a given patent. (*Id.* at 2408). One of these ways is to tie the post-expiration royalties to a separate right that exists independently of the expired patent—such as another patent. (*Id.*). So when a licensing agreement covers multiple patents, "royalties may run until the latest-running patent covered in the parties' agreement expires." (*Id.*). This doctrine has been called the "tying" or "bundling" exception. (*Scheiber*, 293 F.3d at 1019–20).

## B. Application

ICON argues that requiring it to pay royalties in this case would run afoul of the patent-misuse doctrine. Its argument goes as follows:

1) *Brulotte* and its progeny hold that royalty agreements that project beyond the expiration date of a given patent are unenforceable unless the royalties are tied to another, independently existing right—the bundling exception.
2) Nautilus's U.S. patents all expired on or before January 25, 2015.
3) Therefore, any agreement to pay royalties on products covered by the U.S. patents after January 25, 2015, is unenforceable unless those royalty payments are tied to another, independently existing right.
4) Nautilus attempts to tie the royalty payments on products sold in the U.S. and covered by the expired U.S. patents to its rights in the Chinese patent.
5) But the tying exception is inapplicable when the independent right to which royalty payments are tied is a foreign patent.
6) Therefore, the tying exception is inapplicable to this case and ICON cannot be made to pay royalties on the sale of products in the U.S. that would be covered by the expired U.S. patents.

The Court disagrees with this line of reasoning because it mischaracterizes the facts of this case and the scope of the rule set forth in *Brulotte*.

ICON treats Nautilus's demand that ICON make royalty payments on the sales of its products to U.S. customers as an attempt by Nautilus to tie the expired U.S. patent to the Chinese

patent.  But that is not so.[6]  Nautilus asserts that ICON owes it royalty payments because the products ICON sold in the U.S. were directly covered by the Chinese patent itself, not because the products were covered by the U.S. patent and then tied to the Chinese patent.  There is no tying involved in Nautilus's argument.  In reality, we have a situation in which patents from multiple sovereigns overlap.  The products in question—unassembled component parts and assembly instructions packaged in and shipped from China, but sold to U.S. customers—were covered by the U.S. patent before it expired.  But as the Court explained at length above, these products were also covered by the Chinese patent during this same time frame and afterward until the expiration of the Chinese patent.

ICON's real patent-misuse argument then, is that it thinks that it shouldn't have to pay royalties for U.S. sales of its products under a Chinese patent.  This raises interesting questions about the extraterritorial effects of patents and the interaction between patent law and contract law. In considering this issue, it is important to remember that this is a contract action, not an infringement action.  (*C.f. Scheiber*, 293 F.3d at 1019 ("[The plaintiff] isn't suing for infringement; he's suing to enforce a license agreement.").  Whether an American court would uphold an infringement suit based on the sale of products in the U.S. covered by a Chinese patent, or whether a U.S. court would enforce a Chinese judgment of infringement in such a case, then, is another issue entirely.  This is not an action to punish ICON for infringing a Chinese patent pursuant to United States patent policies, but an action to uphold ICON to its contractual obligations.  ICON agreed to pay royalties on the sale of products covered by the Chinese patents as determined by

---

[6] Even if this was so, the Court is dubious ICON's assertion that the tying/bundling exception to the patent-misuse doctrine is inapplicable to a situation where a licensing agreement bundles a foreign and a domestic patent.  But the Court need not reach this issue because the tying/bundling exception is not actually relevant to the outcome of this case.

Chinese patent law. And nothing in *Brulotte* or any other facet of U.S. patent law renders such a contract unenforceable.

The Ninth Circuit made clear why *Brulotte* does not extend so far in a case substantially similar to this one. (*Zila, Inc. v. Tinnell*, 502 F.3d 1014 (2007)). In *Zila*, a patentee secured several patents, two of which are of primary concern to us, an American patent and a Canadian patent. (*Id.* at 1017–18). The U.S. patent expired in 1998. (*Id.* at 1018). The Canadian patent did not expire until 2002. (*Id.*). The patentee licensed these patents to Zila in exchange for royalties. (*Id.* at 1017). Eventually, Zila sued seeking a declaratory judgment that, under *Brulotte*, it was not obligated to pay any royalties on either the Canadian or the U.S. patent following the expiration of the U.S. patent in 1998. (*Id.* at 1018). But the Ninth Circuit disagreed, finding that the expiration of the U.S. patent had no effect on Zila's contractual obligation to pay royalties on sales of products covered by the Canadian patent. (*Id.* at 1023–24). The Ninth Circuit provided the following reasoning:

> [*Brulotte* does not] extend its royalty-canceling powers to contracts for foreign patents. *Brulotte* concerned patent rights in the United States, and reflected the Court's fear that a patent holder would abuse his federally bestowed monopoly to extract payments beyond the term of *that* patent. The "patent" at issue in *Brulotte* [was] an American one, and its dispositive effect on state contract law is a consequence of the Supremacy Clause. State law is not displaced merely because the contract relates to intellectual property . . .; the states are free to regulate the use of intellectual property in any manner not inconsistent with *federal* law. The rights and obligations bestowed by the international patent regime played thus no role in *Brulotte*.
>
> Nor should they. The Canadian patent is an entirely separate asset from the U.S. patent. The fact that the asset is a foreign patent, as opposed to foreign real estate or other real property held outside the country, does nothing to change the propriety and competency of state contract law to dispose of it. *Brulotte* has no self-executing international effect and only displaces state contract law with

> respect to royalty obligations related to federally-bestowed patent
> rights.
>
> In light of these observations, . . . [e]ven if the principle announced
> in *Brulotte* were to obviate Zila's obligation to pay royalties on the
> [American] patent once it expired, . . . it [does not] displace[] Zila's
> obligation to pay royalties on the valid Canadian patent."

(*Id.* (internal quotations omitted) (emphasis in original)). This Court wholly agrees with the Ninth

Circuit's reasoning. Texas contract law is fully competent to dispose of the rights and obligations

owing under the contract as it pertains to the Chinese patent. *Brulotte* has nothing to say on the

matter. Therefore, the Court's conclusion that ICON must pay royalties on the sales of the disputed

products does not violate the patent-misuse doctrine even though those products were sold in the

U.S. after the U.S. patent expired. The disputed products were covered by the Chinese patent, and

that is enough.

## IV.    Damages

Having established that ICON violated the contract, the Court turns to the issue of

damages. Nautilus admits that "ICON has already paid Nautilus $964,899.17 in royalties for the

ICON products" at issue in this case. (ECF #42-3 ¶22). These royalties were paid by ICON in

2015 before it decided that it no longer needed to pay royalties. Nautilus asserts that the remaining

royalties owed by ICON amount to "at least $1,507,408," a figure that ICON does not seriously

dispute. (*Id.* ¶24). Nautilus also claims that it is "entitled to late payment interest in the amount

of $275,100." (*Id.* ¶22). The Court agrees that Nautilus is entitled to this interest under Section

3.5 of the contract, entitled "Past Due Payments," which provides that if "any amount due under

[the contract] is not paid by Licensee when due, . . . such unpaid amounts shall bear interest at the

greater of (a) the maximum rate permitted by law, or (b) the rate of one and a half percent (1½%)

per month (or part thereof as the case may be) from the date when due until the date of payment." (ECF #39-2 at 7, ¶3.5).

In total, then, the Court finds that the total amount of damages in this case is at least $1,782,508. The Court will render judgment in favor of Nautilus in that amount.

Nautilus also says that it is entitled to "attorney's fees, and expert and other costs under the contract." (ECF #42-3 ¶25). Nautilus is clearly correct under the plain language of Section 8.3 of the contract, which states that if "any action at law or in equity is necessary to enforce or interpret the terms of [the contract], the prevailing party shall be entitled to reasonable attorney's fees, experts' fees, costs and necessary disbursements." (ECF #39-2 at 12, ¶8.3). Nautilus may file a separate motion for attorney's fees if it so desires.

### Conclusion

For all of these reasons, the Court will **GRANT** Nautilus's motion for summary judgment, **DENY** ICON's motion for summary judgment, enter judgment in favor of Nautilus, and **DENY AS MOOT** all other outstanding motions in this case.

**A separate order shall issue.**

SIGNED this _____ *19th* _____ day of January, 2018.

HONORABLE ROYCE LAMBERTH
UNITED STATES DISTRICT JUDGE